## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

TODD GREENWALD,

               Plaintiff,

vs.

LIBERTY LIFE ASSURANCE
COMPANY OF BOSTON; WELLS
FARGO & COMPANY; WELLS
FARGO & COMPANY SHORT-TERM
DISABILITY PLAN; WELLS FARGO
& COMPANY LONG-TERM
DISABILITY PLAN,

               Defendants.

4:12-CV-3034

MEMORANDUM AND ORDER

---

Plaintiff Todd Greenwald brings this case under the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 *et seq*. Greenwald asserts three claims for relief. His first claim is for benefits under the Wells Fargo Short-Term Disability Plan (the "STD Plan" or "the Plan"). Greenwald argues that Wells Fargo and Liberty Life Assurance Company of Boston erroneously denied his claim for STD benefits.[1] Previously, the parties agreed to remand Greenwald's second claim, for benefits under the Wells Fargo Long-Term Disability Plan (the "LTD Plan"), for administrative review. Filing 35. On remand, Liberty Life approved Greenwald's claim for benefits under the LTD Plan, and the parties have since stipulated to dismiss this claim, with prejudice. *See* filings 60, 81, and 82. Greenwald's third claim seeks statutory penalties under 29 U.S.C. § 1132(c) for Wells Fargo's failure to produce certain plan documents.

The parties have agreed to resolve Greenwald's pending claims as if cross-motions for summary judgment had been filed. *See* filing 40. Greenwald has also moved to strike (filing 54) portions of an affidavit submitted by defendants (filing 51-1). The Court has considered the pleadings, briefs, administrative record, and the parties' additional evidence (filings 47 and 51).

---

[1] Greenwald's first claim is asserted against all defendants except Wells Fargo & Company Long-Term Disability Plan. *See* filing 38 at 2.

For the reasons discussed below, the Court finds that defendants' decision to deny Greenwald's claim for short-term disability benefits was not supported by substantial evidence, and summary judgment will be entered in favor of Greenwald on his first claim. That claim will be remanded for further administrative proceedings consistent with this opinion. The Court finds, however, that Liberty Life is not a proper defendant to that claim, and Greenwald's first claim will be dismissed as to Liberty Life. The Court further finds that Greenwald is entitled to summary judgment on his claim for statutory penalties. Greenwald has also requested an award of attorney fees under § 1132(g)(1). He may be entitled to such an award, and the Court requests the parties to submit additional briefing on the issue. Finally, Greenwald's motion to strike will be denied as moot.

## FACTUAL BACKGROUND

The STD Plan was a self-insured plan covered by ERISA; Wells Fargo was the Plan's sponsor and administrator. Filing 48 at ¶ 3; filing 39-3 at 47, 145, 225. Liberty Life was the claims administrator for the STD Plan. Filing 48 at ¶ 2. Greenwald was a long-time employee of Wells Fargo and participated in the STD Plan. Filing 48 at ¶¶ 1, 7. He was employed as an "ITS Relationship Manager 2." Filing 39 at 65; filing 39-1 at 148. He was responsible for, among other things, developing and maintaining customer relations for large and complex institutional trust accounts and ensuring that accounts met regulatory and internal banking requirements. Filing 48 at ¶ 5.

Greenwald's position required him to work 8 hours a day and 40 hours a week. Filing 39 at 85. Wells Fargo provided a description of the physical and mental demands of Greenwald's job. Filing 39 at 85. He was required to: "frequently" sit for 3 to 6 hours per day, "occasionally" walk 30 minutes to 3 hours per day, occasionally stand 30 minutes to 3 hours per day, and occasionally drive a car to meet with clients. Filing 39 at 85–86. When Greenwald drove to meet clients, the trips ranged from 110 to 800 miles round-trip. Filing 39-4 at 44. Greenwald's day-to-day duties mostly involved working on a computer, talking on the phone, and attending meetings. Filing 39 at 65.

Before moving to a more detailed discussion of the facts underlying this case, the Court will briefly summarize how the parties arrived before the Court. Greenwald has reported experiencing chronic lower back pain for at least the last 12 years. His back problems were the result of several factors, including scoliosis, muscle weakness in his right leg resulting from surgery to remove a tumor, and degenerative disc disease. Since 2005 he has been prescribed strong pain control medications, undergone multiple spinal surgeries, and participated in various forms of physical therapy.

Shortly before Greenwald filed the claim for STD benefits that underlies this case, he applied for and received STD benefits for an unrelated problem with his neck. On January 5, 2011, Greenwald underwent a planned surgery on his neck: a microdiscectomy and fusion[2] at the C5-6 level.[3] Filing 48 at ¶ 8. Greenwald applied for and received STD benefits from January 12 to January 17. Filing 48 at ¶ 8. Following surgery, he was released by his physician to return to work 4 hours per day from January 18 through January 31. Filing 48 at ¶ 9. Partial STD benefits were also approved for that period of time. Filing 48 at ¶ 9.

On February 1, 2011, Greenwald returned to work full time. Filing 48 at ¶ 10. Soon after returning to work, Greenwald found he could not perform his job duties. He claims that he experienced fatigue and severe pain as a result of problems with his back and right hip, as well as pain and numbness in his right leg. Filing 48 at ¶ 10. He also claims that the pain medications he was taking made it difficult to concentrate. Greenwald left work on February 23, after working a 5-hour day. Filing 48 at ¶ 10. On February 25, Greenwald reapplied for STD benefits. Filing 48 at ¶ 11. On March 28, his claim was denied on its first review by Liberty Life. Filing 39-1 at 109–112. Greenwald appealed, and the denial was affirmed by Liberty Life on May 2, and affirmed again on the final level of review by Wells Fargo on September 8. Filing 39 at 70–74; filing 39-4 at 17–19.

Before discussing Greenwald's medical history, the Court will review the terms of the STD Plan. The Court will then provide a brief chronological summary of the medical records generated up to Greenwald's February 25,

---

[2] A microdiscectomy is a procedure whereby a small portion of an intervertebral disc is surgically removed through a small incision using a microscope and special equipment. University of Maryland Medical Center, *Diskectomy – Overview*, http://www.umm.edu/ency/article/007250.htm (last accessed March 20, 2013). In a spinal fusion, a surgeon permanently connects two or more vertebrae, eliminating motion between them. Mayo Clinic Staff, *Spinal Fusion – Definition*, http://www.mayoclinic.com/health/spinal-fusion/my01235 (last accessed March 20, 2013).

[3] The spine is composed of 32 vertebrae divided into 5 sections; the vertebrae are referred to by a letter indicating the section and a number that increases as one moves down the spine, away from the head. *See, e.g.*, Mayo Clinic, *Spinal Anatomy*, http://www.mayoclinic.com/health/medical/IM02726 (last accessed March 20, 2013); *Stedman's Medical Dictionary*, Plate A8: Skeleton, Lateral View (27th ed. 2000). The four sections referred to in this case are, from the highest to lowest, cervical (C), thoracic (T), lumbar (L), and sacrum or sacral (S). So, a reference to L5-S1, for example, refers to the bottommost lumbar vertebra and the uppermost sacral vertebra, or the space between these vertebrae.

2011, application for STD benefits. It is worth noting, however, that when Greenwald first submitted his claim, he did not include the majority of these records. After the first denial, the medical records and defendants' eligibility determinations follow a more predictable chronological path.

## I. The STD Plan

The STD "Plan Document" and "Summary Plan Description" were contained in one "Benefits Book."[4] Filing 39-3 at 1, 9–48, 143–55, 209–226. Chapter 9 of the Benefits Book was entitled "Short-Term Disability Plan" and explained that it, together with "'Chapter 1: An introduction to your benefits' and 'Appendix B: Legal notifications' . . . constitute[d] the Summary Plan Description" for the STD Plan. Filing 39-3 at 12, 145. Chapter 1 explained that the Benefits Book contained summary plan descriptions for various benefit plans, but that these summaries could not "replace or change any provision of the <u>actual plan documents</u>." Filing 39-3 at 11 (emphasis supplied). And in the case of a conflict between the summary descriptions and "the official plan document," the official plan document controlled. Filing 39-3 at 11. The Benefits Book also explained how employees could obtain copies of official plan documents. Filing 39-3 at 11. In actual fact, however, there was no separate "official" plan document for the STD Plan. Filing 47 at 4–5; filing 51-1 at ¶ 14.

Appendix B provided that, as plan administrator, Wells Fargo had "full discretionary authority to administer and interpret each plan and may delegate its duties and discretionary authority to certain designated personnel and third parties, including but not limited to the Director of Human Resources and the Director of Compensation and Benefits." Filing 39-3 at 225.

The STD Plan would have replaced 100% of Greenwald's "covered pay" for up to 26 weeks. Filing 39-3 at 151–52; filing 39-4 at 65. It was designed to provide employees with salary replacement if they had a "medically certified health condition," which was defined as a disabling injury or illness that

> [i]s documented by clinical evidence as provided and certified by an approved care provider. Clinical evidence may include medical records, medical test results, physical therapy notes, mental health records, and prescription records.
> [and]

---

[4] The record contains two copies of the STD Plan. The Court has compared both and found no relevant differences. *Compare* filing 39-3 at 143–155 *with* filing 39 at 44–56.

> Prevents [the claimant] from performing the essential functions of [his] own job as regularly scheduled for longer than the STD waiting period.

Filing 39-3 at 145, 148. A condition was classified as "recurrent" if it "starts again within 30 calendar days after [the claimant has] been released to return to work" and was due to the "same cause or complication resulting from the initial medically certified health condition." Filing 39-3 at 150. Defendants treated Greenwald's current claim as a recurrent condition. Filing 57 at 10 n.2. This did not affect his eligibility for benefits, but would have limited the total amount of benefits he could have received. Filing 39-3 at 150.

The STD Plan stated that it was Greenwald's "responsibility to ensure that Liberty receives requested medical proof, which may include medical records, test results, and hospitalization records . . . ." Filing 39-3 at 149. The Plan gave Liberty Life the right to request independent medical examinations, as well as functional, psychological, rehabilitative, and vocational evaluations. Filing 39-3 at 150. Finally, the Plan stated that benefits could end before the maximum payout if, among other reasons, Greenwald failed to provide requested medical records or failed to provide "objective medical proof in a timely manner." Filing 39-3 at 152.

## II. Greenwald's Past Medical History

Greenwald's medical history reveals a long struggle with pain caused by complicated back and postural problems. At age 16, he was diagnosed with scoliosis, and in 2011, still had significant curvature in his spine. Filing 39-1 at 42, 81, 88; filing 39-4 at 38. In 1994, Greenwald had a tumor removed from his right upper leg. Filing 39 at 135, 150. This required excision of the anterior compartment of his right thigh, including the femoral nerve, which resulted in a loss of some femoral nerve function, paralysis of the hip flexors, and paresthesia[5] in his right lower extremities. Filing 39 at 132, 135, 150. Greenwald also had significant weakness on his right side in his iliopsoas, quadriceps, and hip flexors, and weak right knee extension. Filing 39 at 132.

Greenwald has dealt with chronic lower back pain for at least the last 12 years. In August 2000, he met with Dr. Brandon Webb (his family physician) to discuss lower back pain. Filing 39-1 at 81. He stated that about twice a year his back would "go out" on him and cause sudden, intense pain. Filing 39-1 at 81. The pain was located in the right lower lumbar area and

---

[5] Paresthesia refers to an "abnormal sensation, such as of burning, pricking, tickling, or tingling." *Stedman's Medical Dictionary* 1316 (27th ed. 2000).

extended into the gluteal area and coccyx, with some pain radiating into the right lower extremity. Filing 39-1 at 81. It was worse when bending or getting up and down from a chair. Filing 39-1 at 81.

Beginning in January 2005, Greenwald met with several doctors to discuss worsening back pain. On January 11, 2005, he met with Dr. Randon Johnson of the Nebraska Medical Center's Orthopedic Oncology Clinic. Filing 39 at 137. Greenwald described pain in the same areas as in 2000. Filing 39 at 137. It was present when sitting or standing, and he reported difficulty sitting or standing for long. Johnson noted that Greenwald appeared uncomfortable when sitting for too long. Filing 39 at 137. An examination of his back showed point tenderness on the right side at the L2-L3 level, and one trigger point produced electrical signals that radiated down the buttock and leg. X-rays taken that day showed mild to moderate degenerative changes of his right hip and severe degenerative changes at the L2-L3 level, with significant intervertebral narrowing. Johnson diagnosed him with degenerative disc disease.

On January 19, 2005, Greenwald met with Dr. Benjamin Gelber, a neurosurgeon. Filing 39 at 135. He again reported that sitting and standing worsened the pain, and that while lying down helped, he had to change position frequently. Filing 39 at 135. Gelber examined Greenwald and noted "considerable paraspinal muscle spasm bilaterally" and tenderness at the right sacroiliac (SI) joint. Gelber reviewed an MRI and found some changes in the upper lumbar spine, and a bulging disc at the L2 level, but no signs of nerve root compression or significant spinal stenosis.[6] Filing 39 at 135; filing 39-1 at 5–7. Gelber concluded that the back pain was related to changes in posture related to weakness in Greenwald's quadriceps and iliopsoas muscles and "other degenerative changes in the spine" which caused a loss of sagittal balance and placed increased stress on the SI joint and spine. Filing 39 at 135. Gelber did not think surgery was warranted and referred Greenwald to physical therapy and recommended a right SI joint injection (an "SI block"). Filing 39 at 133. Greenwald received the SI block, but it provided no relief. Filing 39 at 134.

On January 31, 2005, Greenwald met with Dr. David Diamant, a physical medicine and rehabilitation pain specialist. Filing 39 at 134. Diamant reviewed the MRI and noted degenerative disc disease, with a loss of hydration in the L4-5 and L5-S1 discs, a loss of height at L5-S1 and L2-3,

---

[6] Lumbar spinal stenosis refers to a narrowing of the spinal canal caused by degenerative or traumatic changes at the level of the lumbar vertebrae. *Taber's Cyclopedic Medical Dictionary s.v.* "Stenosis, lumbar spinal stenosis" (LexisNexis 2011).

and a broad-based bulge at L2-3. Diamant administered a second SI block that day.

On February 14, 2005, Greenwald met with Dr. Geoffrey McCullen, a neurosurgeon. Filing 39 at 132. The SI injections and physical therapy had failed to offer significant relief. Filing 39 at 132. McCullen observed that Greenwald was slow in moving from a seated position to standing, and had diffuse tenderness in the lumbosacral area.

Greenwald returned to McCullen on March 1, 2005, after undergoing a lumber discogram.[7] Filing 39 at 131–32; filing 39-1 at 25–26. Like Gelber, McCullen concluded that Greenwald's symptoms were likely the result of scoliosis and asymmetrical muscle function resulting from the surgery on his right hip. Filing 39 at 131. McCullen concluded, "[u]nfortunately, there is no easy solution here." Filing 39 at 131. Greenwald reported that his pain was severe enough that he could not work, and had been off work for 7 weeks. He also stated that the pain medications he was taking made it difficult to concentrate, and that the pain itself was distracting. He could not sit or stand for long. McCullen noted that "[c]learly he would like to return to work," but given his reports of pain, did not believe he could return to work at that time. McCullen referred him to Dr. Mark Dekutoski, a spinal surgeon with the Mayo Clinic.

Greenwald met with Dekutoski beginning in April 2005. Filing 39 at 123. He reported that he could not walk more than 1 block at a time, or stand for more than 3 to 4 minutes at a time. Filing 39 at 123. He reported that his symptoms were worse when riding in a car and that he had difficulty falling asleep. Dekutoski agreed that Greenwald's L2-3 disc was severely degenerated and decided to treat it with a fusion. Filing 39 at 114–18. Dekutoski noted that it was "quite understandable" that Greenwald was reporting disabling pain, because his loss of leg muscle required "lumbar flexion for his hip thrust and leg thrust portions of his gait. This basically requires a significant dynamic mobility through this painful degenerative segment." Filing 39 at 119. On May 18, Dekutoski performed a L2-3 lumbar interbody fusion. Filing 39 at 116–17.

Dekutoski's notes reveal that, at some point around May 2005, Greenwald was on temporary disability and "working to become on permanent disability for his back pain." Filing 39 at 128. But the surgery succeeded in improving his right lower back pain. Filing 39 at 105. And following the surgery, Dekutoski advised Greenwald how to recover and

---

[7] During a discogram, dye is injected into the center of an intervertebral disc, and the result is then viewed with an x-ray or CT scan. Mayo Clinic Staff, *Definition of "Discogram"*, http://www.mayoclinic.com/health/discogram/MY01038 (last accessed March 20, 2013).

return to work. Dekutoski noted that Greenwald was "severely deconditioned" and advised him to work diligently on aerobic conditioning, physical therapy, and strengthening. Filing 39 at 112. Greenwald later reported that he was pleased with the results of the surgery and physical therapy and was able to return to work. Filing 39 at 105.

On July 17, 2006, Greenwald again met with McCullen, this time reporting pain in his <u>left</u> leg. Filing 39 at 105. Although the surgery had helped with the right lower back pain, he reported that he had continued to experience pain in his left lower back which radiated into his left leg. Filing 39 at 105. McCullen noted that these symptoms could be caused by a problem at the L5 level. Greenwald had previously received an epidural steroid injection that did not offer lasting relief. McCullen concluded, "[u]nfortunately, there is no clear-cut option. The patient [has] multiple areas of degenerative condition, any of which could be contributing" to the ongoing pain. McCullen urged him to focus on exercising and to keep his weight down. A week later, Greenwald received another epidural steroid injection at the left L5 level. Filing 39 at 104.

After more conservative treatment failed, Greenwald underwent a second spinal fusion on January 3, 2007, this time at the L5-S1 level. Filing 39-1 at 20; filing 39 at 100. At the follow-up appointment with McCullen on February 5, Greenwald reported that he felt he was making progress, but was in too much pain to return to work. Filing 39 at 100. McCullen forecast that he could return to work half-time in 4 weeks and full time after another 3 weeks, and recommended more physical therapy.

Greenwald next saw McCullen on July 28, 2008. Filing 39-1 at 44. He had suffered an acute onset of increasing back pain while bending over earlier in the month. Filing 39-1 at 20. The pain was located in his right back and groin and down the right leg, and he reported pain when moving and sitting down, and numbness in his right foot. Filing 39-1 at 20. McCullen reviewed an MRI and found that Greenwald's right disc was herniated at the L4-5 level, and that this was causing compression of the right L5 nerve root. Filing 39-1 at 44. Again, epidural steroid injections had provided only limited relief. Filing 39-1 at 44, 46. On August 5, Greenwald underwent a microdiscectomy at the right L4-5 level. Filing 39-1 at 20–23, 44, 83. On August 15, Greenwald met with McCullen's physician assistant, Mike Koebernick. Greenwald reported that the pre-surgery pain was gone, and the numbness in his right foot was improving. Filing 39-1 at 40.

Greenwald next saw McCullen on June 24, 2009, again reporting back pain. Filing 39-1 at 39. An x-ray taken that day showed that his scoliosis had not progressed, and the L2-3 and L5-S1 fusions appeared stable. An examination revealed tight posterior muscles, especially on the left. McCullen

- 8 -

concluded that the pain was possibly related to disc degeneration, and referred Greenwald to Dr. Phillip Essay, a pain management specialist.

On June 26, 2009, McCullen reviewed an updated lumbar MRI and x-ray of Greenwald's scoliosis taken the day before. Filing 39-1 at 38, 88. He found no recurrent disc herniation at the L4-5 level, and no significant stenosis. Filing 39-1 at 38. He found that there were "elements of degenerative disc change at multiple levels that appear to be mild-moderate." McCullen's only recommendation was to see a pain specialist and a psychologist.

In the fall of 2009, Greenwald injured his shoulder when reaching behind himself. Filing 39-1 at 62. He saw Webb in March 2010, who referred him to an orthopedist, Dr. Douglas Koch. Filing 39-1 at 34–36. Koch treated Greenwald with a cortisone injection in April 2010 and another in September 2010. Filing 39-1 at 33–36. Greenwald was still reporting pain in October, and on October 5, 2010, he met with Koebernick. Filing 39-1 at 32–33. He reported increasing pain in his neck, right shoulder, and right arm that had worsened since August. Filing 39-1 at 32. The pain extended into his upper arm and fingers. The cortisone injections had not provided significant relief, nor had prescription pain control medications. Koebernick noted that Greenwald's symptoms were consistent with C6 radiculopathy.[8]

Greenwald met with McCullen on November 9, 2010. Filing 39-1 at 30. McCullen noted cervical spondylolysis[9] and neural foraminal narrowing[10] at the right C5-6 level. McCullen and Greenwald decided on surgical treatment: an anterior cervical microdiscectomy at the C5-6 level. Filing 39-1 at 17–19. The surgery was performed on January 5, 2011. Filing 48 at ¶ 8.

Greenwald saw Koebernick on February 2, 2011, for a follow-up. Filing 39-1 at 29. Koebernick noted that overall, the surgery had gone well. It had resolved the pain and numbness in Greenwald's right arm, although he still had some neck and intrascapular pain. Koebernick also noted that Greenwald was reporting "a lot of generalized aches and pains he has had

---

[8] Radiculopathy refers to a disorder of the spinal nerve roots. *Stedman's Medical Dictionary* 1503 (27th ed. 2000).

[9] Spondylolysis refers to the degeneration of a portion of the vertebrae. *Stedman's Medical Dictionary* 1678 (27th ed. 2000).

[10] Neural foraminal narrowing refers to a reduction in the size of the opening in the spinal column through which the nerve exits; as the opening narrows, the nerve becomes compressed. Spine-health, *Neuroforaminal Narrowing Definition*, http://www.spine-health.com/glossary/n/neuroforaminal-narrowing (last accessed March 20, 2013).

this [sic] for years, as well as joint aches." They discussed the possibility of a rheumatological problem.

February 23, 2011, was Greenwald's last day of work. Filing 48 at ¶ 10. On February 25, he met with Webb to discuss problems with chronic pain. Filing 39-1 at 118. Greenwald reported that the pain had become worse over the last year, and had progressed to the point that he did not think he could work. He stated that if he took enough medication to control the pain, he would not be able to focus or function; but without medication, the pain was too intense to focus. His sleep had also become worse, especially over the last month, because he could not find a comfortable position, due to pain in his neck, back, and right lower extremity. And at work, the pain and fatigue were such that he had to lie on the floor and avoid sitting or standing for periods of time. Filing 39-1 at 118. He was also experiencing paresthesia in his right lower extremity and had recently fallen down a few times as a result. Webb diagnosed him with chronic pain, scoliosis, history of right hip sarcoma, and degenerative disc disease (cervical and lumbar).

### III. The Current Claim for STD Benefits

On February 25, 2011, Greenwald called Liberty Life to apply for STD benefits. Filing 39 at 62–63; filing 48 at ¶ 11. He summarized his medical history and ongoing back and leg pain and stated that these had progressed to the point where he was unable to work. Filing 39 at 62–63. He did not know what his treatment plan was, as Webb had simply told him to rest. Filing 39 at 62. And although he had visited a pain management clinic in the past, he was not doing so at that time. Filing 39 at 62–63.

Liberty Life sent a request for medical records to Webb, specifically for updated medical information from February 20, 2011, onward, including diagnostic test results. Filing 39 at 63; filing 39-1 at 128–31. Webb responded by sending a one-page summary of Greenwald's February 25 office visit. Filing 39-1 at 118. This was the only evidence that was submitted in support of Greenwald's claim.

Liberty Life referred Greenwald's claim to Karen Hughes, a "Nurse Case Manager," to review the medical records and Greenwald's reported symptoms. Filing 39 at 62. Hughes found that Greenwald's "restrictions and limitations" were not clear. Filing 39 at 62. She noted that no physical examination had been performed at the February 25, 2011, visit, and that Liberty Life had no records of any treatment plan, referrals to other providers, diagnostic studies, or prescriptions. Filing 39 at 62; *see also* filing 39-1 at 118. Hughes attempted to contact Webb by telephone but was unable to reach him. Filing 39 at 61–62. So, she mailed a letter to Webb requesting

additional information, with a deadline of March 25. Filing 39 at 61; filing 39-1 at 113–15.

When Webb did not respond, Liberty Life determined that Greenwald's claim should be denied. Filing 39 at 60. Liberty Life found that Greenwald had failed to provide exam findings or diagnostic studies to corroborate his self-reported symptoms and that it was therefore unable to determine his restrictions and limitations. Filing 39 at 60; filing 39-1 at 110. Liberty Life notified Greenwald of its decision by letter dated March 28, 2011, and by phone the same day. Filing 39-1 at 109–12; filing 39 at 60. The denial letter informed Greenwald that if he wished to appeal, he should include "all documentation, such as office visit notes and diagnostic test results to include abnormal physical examination findings that would prevent you from performing your job duties [and] any additional information which you feel will support your claim for continued benefits." Filing 39-1 at 111.

On March 28, 2011, shortly after Greenwald was notified of the denial, Webb's office faxed a response to Liberty Life's request for information. Filing 39 at 59–60; filing 39-1 at 105–08. Liberty Life's form had asked Webb to provide: (1) his specific diagnoses with results of diagnostic studies to support Greenwald's reports of intense pain; (2) objective exam findings and testing to support Greenwald's claims of cognitive deficits; (3) Webb's objective physical exam findings, because no such exam was performed on February 25; (4) the specific restrictions and limitations that Webb was placing on Greenwald's activities, with special instructions to address Greenwald's ability to sit, stand, walk, lift, and bend; and (5) any treatment plan to improve Greenwald's functional capabilities and any referrals to a comprehensive pain management program. Filing 39-1 at 114–15. Despite the amount of information requested, the form stated that Webb should respond "directly on this letter." Filing 39-1 at 114.

As Liberty Life had requested, Webb responded simply by filling out the form. He prefaced his response by stating that he was not a disability determination physician, but Greenwald's long-time family doctor. Filing 39-1 at 107. He diagnosed Greenwald with scoliosis, degenerative disc disease (cervical and lumbar), and right hip sarcoma. Filing 39-1 at 107. In response to the request for diagnostic studies to support these conditions, he stated that he would be sending a copy of Greenwald's medical records.

Webb asked what type of "objective exam" Liberty Life would like to see with regard to Greenwald's claimed cognitive deficits. Filing 39-1 at 107. He wrote that his exam for a mental condition involved his "intuition and trust" in Greenwald, who he had seen for the past 12 years. In response to the request for "objective physical exam findings" Webb stated, "I can send you a recent exam from 12/10 or can have him come back for a focused exam of the

areas you request. Again, I am not qualified to do official disability determinations or impairment ratings."

Webb stated that Greenwald's restrictions and limitations were such that he could not sit or stand for more than 30 minutes at a time, walking was limited by leg pain, and that he should avoid lifting more than 20 pounds due to his hip and lower back problems. Filing 39-1 at 108. Webb's plan to improve Greenwald's functional capacities was "rest [and] pain management." Filing 39-1 at 108. Greenwald had not been referred to a comprehensive pain management program, but Webb had discussed the option with him.

On March 29, 2011, Greenwald called Liberty Life and spoke with Kristina Houser, the "return-to-work specialist" handling his case. Filing 39 at 59; filing 52 at ¶ 4. He stated that he wished to appeal and expressed frustration with his condition. Filing 39 at 59. According to Houser's notes of the call, Greenwald "kept asking what he needs to do" but she only advised that she could not recommend treatment and explained the appeals process. Greenwald stated that he had been trying to work with his conditions and pain for 15 years and there was nothing more his physicians could do for him. She also noted that he had "no treatment . . . set up, no plan to get better or back to work. [Greenwald] said he simply cannot perform his job duties any longer . . . ."

On April 1, 2011, Webb's office called Houser to ask if and when he would receive answers to his questions about what kind of objective examination Liberty Life was looking for regarding Greenwald's cognitive deficits and whether it wanted the results of a December 2010 physical exam or a newer "focused" physical examination. Filing 39 at 59. Houser responded only that she was "not able to recommend treatment." Filing 39 at 59. Thereafter Webb faxed Liberty Life the entirety of the medical records discussed above. Filing 39-1 at 1–103; filing 39 at 97–150.

## IV. Liberty Life's Second Denial

Liberty Life referred Greenwald's file to Nurse Case Manager Hughes for further review. Filing 39 at 58. Hughes noted that Greenwald had been released to return to work in January 2011 and that the records did not show a worsening of symptoms or change in medications since at least March 2010. Filing 39 at 58. Hughes was unable to determine if Greenwald's conditions supported "long[-]term restrictions and limitations." Liberty Life referred the claim to Dr. Eric Kerstman for an independent peer review. Filing 39 at 57, 76–77. Kerstman was certified in physical medicine and rehabilitation with a specialty in pain medicine. Filing 39 at 80. Liberty Life asked Kerstman to determine whether Greenwald's conditions translated to restrictions and

limitations on his ability to work, whether those restrictions were supported by medical evidence, and to specifically address how they affected his "sustained sedentary capacity." Filing 39 at 83.

In conducting his review, Kerstman spoke briefly with Webb. Webb repeated that he was not a disability expert and stated he had not outlined any specific restrictions or limitations and had no opinion regarding Greenwald's work capacity or whether he was disabled. Filing 39 at 77. Kerstman called and spoke with Koebernick, who also stated that McCullen had placed no specific limitations or restrictions on Greenwald. Kerstman also reported that Koebernick had stated Greenwald's "maximum work capacity is Sedentary Physical Demand Level."

Kerstman reviewed Greenwald's medical records and concluded that they supported diagnoses of chronic neck and lower back pain and scoliosis. Filing 39 at 79. Kerstman concluded that

> [t]hese impairments translate to restrictions and limitations of lifting and carrying a maximum of 10 pounds occasionally, sitting for 30 minutes at a time, total sitting for 6 hours per day, standing for 15 minutes at a time, total standing for 1 hour per day, walking for 15 minutes at a time, total walking for 1 hour per day, occasional bending and squatting, occasional reaching overhead and below waist/desk level. No restrictions in reaching at waist/desk level. The claimant should have the ability to perform sustained sedentary capacity work.
>
> The above restrictions are permanent. The above impairments, restrictions, and limitations are secondary to the claimant's spine conditions and are supported by the claimant's symptoms and diagnostic testing.

Filing 39 at 78–79. Kerstman noted that Greenwald was taking OxyContin and Percocet. Filing 39 at 77. He also found that, although Greenwald claimed his pain medications interfered with his ability to focus and function, this was not supported by any objective evidence in the record. Filing 39 at 79.

After receiving Kerstman's review, Liberty Life decided to uphold its denial of Greenwald's claim. Filing 39 at 75. Liberty Life informed Greenwald of the decision in a letter dated May 2, 2011. Filing 39 at 70. The letter reviewed the terms of the Plan and the prior proceedings, and quoted extensively from Kerstman's report. Filing 39 at 70–74. The letter noted that the physical demands of Greenwald's job were sedentary in nature and concluded:

- 13 -

The current medical evidence contained in your file does not provide sufficient or current physical exam findings to correlate with a severe and impairing condition that would preclude you from performing sedentary activities, as your job requirements would fall within the parameters of the medically supported restrictions and limitations as outlined above.

Thus, in the absence of clinical evidence to support your inability to perform the sedentary activities consistent with those required to perform your job as an ITS Relationship Manager 2, you do not meet the definition of disability as of February 25, 2011.

Filing 39 at 71, 73.

## V. Greenwald's Final Administrative Appeal

On June 29, 2011, Wells Fargo received a letter from Greenwald, appealing the second-level denial of his benefits. Filing 39-4 at 41–46. Greenwald had enclosed notes from recent visits to McCullen and Koebernick; a personal narrative of his medical conditions, pain, and ongoing treatment; and a letter from Koebernick.

Greenwald met with Koebernick on April 29, 2011, shortly before his previously scheduled 3-month follow-up with McCullen. Filing 39-4 at 38–39; filing 39-1 at 29. At the appointment, Greenwald reported increasing pain on the left and right upper thoracic and lumbar spine. Filing 39-4 at 39. Koebernick noted:

The patient has always worked through his pain in the past. He has been seeing Dr. Essay for this issue as well as us and essentially has been piece-meal [sic] his back because from a true surgical fusion perspective, he would require a large undertaking more than likely from T2 to the sacrum fusion. In the past when I have talked to him [he] has always [said] that when he is at work, he was always able to lie down at times and get relief and then he could continue to work. Secondary to increasing pain on the right side primarily over the last several months, he is unable to work. He is taking more pain medication.

Filing 39-4 at 39. Greenwald also reported increased pain in his anterior thigh (the note does not specify which leg). While Koebernick's physical examination was negative for some indicators of back pain, he did detect "a

- 14 -

lot of spasm" above the L2-3 level and extending up into the thoracic spine, as well as some tenderness on both sides of the lumbosacral region, and "elements of a straight leg raise on the right."[11] Filing 39-4 at 39.

Greenwald met with McCullen on May 3, 2011. Filing 39-4 at 38. McCullen reviewed recently updated x-ray and MRI scans of Greenwald's back. Filing 39-4 at 38, 44. He noted Greenwald's scoliosis, which had not improved.[12] The MRI revealed degenerative changes at L3-4 and L4-5, but no recurrent herniation at those points. Filing 39-4 at 38. McCullen noted that Greenwald was in "moderate pain" and that he rose to his feet slowly. Filing 39-4 at 38. McCullen wrote: "[t]his is a very difficult situation in a person with chronic pain. He is not able to do his job at present because of the level of pain and the use of pain medications that are required to try to help manage the pain." His recommendation was for Greenwald to take the next 6 months off of work to focus on pain management with Essay and to continue pool therapy.

In his June 24, 2011, letter to Wells Fargo, Greenwald also provided a personal narrative of his medical history, how his conditions were limiting his ability to work, and his course of treatment. Filing 39-4 at 41–46. In addition to the medical history discussed above, Greenwald noted that in

---

[11] The straight leg raise is a test performed to diagnose disc disease or sciatic pain that usually results from compression of nerve roots in the lower back and is commonly caused by, among other things, disc disease and spinal stenosis. *See The Merck Manual* 325, 327 (18th ed. 2006).

[12] In 2009, McCullen reviewed an x-ray of Greenwald's spine which showed "a left T2 to T5 curve of 40 degrees, a right T5 to T12 curve of 58 degrees, and no significant scoliosis through the lumbar region." Filing 39-5 at 32. In May 2011, McCullen found "significant right thoracic curvature and a lower grade left lumbar curvature and left upper thoracic curvature. The patient[']s main curve is midthoracic that measures 69 degrees." Filing 39-4 at 38 (emphasis supplied). Greenwald argues that this shows his scoliosis had worsened. The Court cannot say one way or the other.

The first note revealed separate amounts of curvature at different levels of the thoracic spine; the second noted an overall "midthoracic" curve of 69 degrees. The problem is, from these statements, it is not clear if McCullen was measuring the same thing both times. The parties have not provided enough information on scoliosis for the Court to be sure. There are no statements from any of Greenwald's doctors noting a change, or tying that change to any increase in Greenwald's pain. However, McCullen had changed his opinion on Greenwald's *lumbar* scoliosis from a finding of "no significant" curvature to a "lower grade left lumbar curvature." At the very least, it is reasonable to say that Greenwald's scoliosis was not improving.

2009 he saw Essay for radiofrequency neurotomy treatment.[13] Filing 39-4 at 42. This provided partial relief for about 6 months. Filing 39-4 at 42. The record contains no actual notes from Essay or his office.

Greenwald stated that during the past year, his pain had increased and it had become more and more difficult to work. Filing 39-4 at 42. As he stated:

> This is due to a combination of pain in my lower and upper back, right leg, in addition to the psychological effects of my pain medications. Without adequate pain medication, I am unable to concentrate on my work responsibilities due to the intense pain. Unfortunately, I am faced with a Catch-22 because when I am using the pain medications, my cognitive thinking is greatly impaired.

Filing 39-4 at 42. Greenwald explained that sitting for any period of time was very painful. Filing 39-4 at 43–44. Driving to meet clients had become increasingly painful, and he had to pull over multiple times to recline his seat or stretch. Filing 39-4 at 44. He also felt that the pain medications he had been taking (OxyContin and Percocet) made driving a safety risk. Filing 39-4 at 44.

Greenwald explained that, at work, he could only sit for a brief time, and would then have to lie down on the floor or stand and stretch. Filing 39-4 at 44. Walking was also very difficult, and he could only walk briefly before having to sit or lie down. The pain also made it difficult to sleep, which caused him to be very sleepy most of the time. Filing 39-4 at 44.

Greenwald wrote that he had seen Essay again on May 9, 2011. Filing 39-4 at 44. According to Greenwald, Essay changed his pain medications from OxyContin and Percocet to Opana ER and Lyrica.[14] Filing 39-4 at 44. Essay also prescribed aquatic therapy, which Greenwald was doing twice a week since mid-May. Filing 39-4 at 45. He reported that the therapy was helping with his flexibility and energy, but had not helped with the pain. Filing 39-4 at 45. Greenwald saw Essay again on June 9. Essay directed him to continue

---

[13] This is "a procedure to reduce back and neck pain" using "heat generated by radio waves to damage specific nerves and temporarily interfere with their ability to transmit pain signals." Mayo Clinic Staff, *Definition of Radiofrequency neurotomy,* http://www.mayoclinic.com/health/radiofrequency-neurotomy/MY00947 (last accessed March 20, 2013).

[14] Opana ER is an extended-release formulation of oxymorphone. *Physicians' Desk Reference* 1090 (65th ed. 2011). Lyrica is the brand version of pregabalin and is used to treat neuropathic pain. *Id.* at 2802–03.

the pool therapy and increased the dosage of Opana ER. Greenwald reported that as of June 24, the medications had not proven effective. Filing 39-4 at 44. He was scheduled to see Essay again in July and McCullen in August. Filing 39-4 at 45.

Although Greenwald did not include any records from Essay's office, he did include Essay's address and phone number, and invited Wells Fargo to contact Essay if it had any questions. Filing 39-4 at 46. Greenwald did the same for Webb, McCullen, and his then-current physical therapist. Finally, Greenwald's appeal packet included a letter from Koebernick dated June 21, 2011. Filing 39-4 at 36–37. Koebernick summarized Greenwald's medical history and concluded that "we feel that [Greenwald] would be an excellent candidate to receive disability." Filing 39-4 at 37.

Wells Fargo submitted Greenwald's claim, including the newly submitted information, to Dr. J. K. Lilly, a medical consultant employed by Wells Fargo Insurance Services and a member of Wells Fargo's Medical Advisory Board. Filing 45 at 1; filing 39-4 at 5. Lilly's report began by stating that the question presented was whether Greenwald's conditions supported "long-term restrictions and limitations." Filing 45 at 1. He noted that Greenwald's position required, among other things, sitting for 3 to 6 hours a day and "occasional" standing and walking, and that Greenwald occasionally had to drive to meet clients. Filing 45 at 1. Lilly then summarized Greenwald's medical history, the administrative correspondence, and Greenwald's symptoms. Filing 45 at 2–5. He carefully discussed Greenwald's personal letter. However, Lilly's otherwise comprehensive summary of the medical records does not reveal whether he read or considered the most recent notes from McCullen and Koebernick.

Lilly noted Greenwald's diagnoses and symptoms, including his reports of persistent neck and lumbar pain. Filing 45 at 6. He stated that these allegations of pain were supported by "the fact that there is diffuse cervical facet arthrosis and diffuse lumbar facet arthrosis. The lumbar arthrosis is possibly attributed to the counter-curve phenomena associated with scoliosis." And, he noted, the record contained frequent mention, from MRI, CT, and x-ray scans, of disc desiccation, osteophyte formation, and degenerative spine changes. Finally, he stated that practically every examiner noted Greenwald was reporting significant pain, and from 2010 onward, mentions of pain were "present in <u>every</u> note available for review." (Emphasis in original.)

However, he went on to find

[u]nfortunately, what is not [sic] missing is <u>significant objective measurements, such as might be found in a functional capacity</u>

- 17 -

evaluation or an occupational medicine evaluation when performed for return-to-work or fit-for-duty examination. The patient's subjective complaints of pain and fatigue appear to be validated by [Webb, McCullen, and Koebernick]. Nonetheless, these are subjective, and the objective findings are scant, other than reports of atrophy and muscle weakness.

With regard to functional limitations, it is apparent that Primary Care Physician, Dr. Webb, is not and will not provide functional limitations since he is quite candidly "not a disability determination or impairment determination physician." These were not offered by Dr. McCullen either, and the question is begged, should a formal evaluation be performed so as to determine any functional limitations based on a formal evaluation of cervical, thoracic, lumbar, and right lower extremity impairments as compared to the work requirements of the job description previously referenced. Second, an impairment rating by a skilled and experienced independent medical evaluator with proven skill interpreting the *AMA Guides for Estimation of Permanent Impairment* is certainly desirable in this case.

Filing 45 at 6 (italics in original, underlining supplied).

Lilly recommended that such an evaluation could be used to decide whether to retire from the workforce, and in support of an application for Social Security disability benefits. Filing 45 at 6–7. Finally, the evaluation could be "presented to the <u>Long-Term</u> Disability Determination Board for consideration regarding whether or not the combined impairments reach the threshold for <u>long-term</u> disability eligibility." Filing 45 at 7 (emphasis supplied).

Lilly then concluded:

At this time with the extensive records available for review, I find myself <u>grudgingly compelled to agree</u> that there is very little objective data contained in a rather exhaustive and well documented health care management history for complex spine, joint, and cancer disease management. Because of the limitations of the plan and the type of opinion this examiner is asked to provide, I can say that the determination for benefits is not supported by objective evidence in the medical documentation as per wording in the plan.

The claimant has made a good argument regarding his capabilities to perform his work and the subsequent liabilities that might occur if he were required to work in a compromised fashion. <u>Therefore, he should be allowed to obtain a functional capacity evaluation</u> with comparison to his job demands and an impairment rating by a skilled and experienced evaluator, such as an occupational and environmental medicine specialist or an independent medical evaluator with skill and experience in musculoskeletal disease management. <u>Once these tests are available, the claimant may approach the Long-Term Disability Board for consideration</u>.

Filing 45 at 7 (emphasis supplied).

By a letter dated September 8, 2011, the Wells Fargo Short-Term Disability Appeal Committee notified Greenwald that it had decided to uphold the denial of his claim. Filing 39-4 at 17. The letter quoted extensively from Lilly's report (although it omitted Lilly's recommendation that Greenwald obtain a functional capacity evaluation and use it to apply for long-term disability and Social Security benefits). Filing 39-4 at 17–19. The letter also omitted Lilly's "grudging" agreement. It concluded that Greenwald's claim was not supported by "objective evidence," such as might be found in a functional capacity evaluation. Filing 39-4 at 19. Like Lilly's report, the letter did not make clear if the Committee had reviewed Greenwald's most recent visits with McCullen and Koebernick.

After the final denial of benefits, Greenwald asked Wells Fargo to provide copies of documents pertaining to his claim and the documents governing the STD and LTD Plans. The Court will discuss these facts in conjunction with Greenwald's third claim, for penalties under § 1132(c).

## STANDARD OF REVIEW
### I. Summary Judgment Standard

Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56. The movant bears the initial responsibility of informing the Court of the basis for the motion, and must identify those portions of the record which the movant believes demonstrate the absence of a genuine issue of material fact. *Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc)*. If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial. *Id.*

On a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts. *Id.* Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the evidence are jury functions, not those of a judge. *Id.* But the nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts. *Id.* In order to show that disputed facts are material, the party opposing summary judgment must cite to the relevant substantive law in identifying facts that might affect the outcome of the suit. *Quinn v. St. Louis County*, 653 F.3d 745, 751 (8th Cir. 2011). The mere existence of a scintilla of evidence in support of the nonmovant's position will be insufficient; there must be evidence on which the jury could conceivably find for the nonmovant. *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 791-92 (8th Cir. 2011). Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Torgerson,* 643 F.3d at 1042.

## II. ERISA
### A. De Novo or Deferential Review

Where an ERISA-covered plan gives the plan's administrator discretionary power to construe ambiguous terms or make eligibility determinations, the administrator's decision is reviewed for an abuse of discretion. *Hankins v. Standard Ins. Co.*, 677 F.3d 830, 834 (8th Cir. 2012). Otherwise, the Court reviews the administrator's decision de novo. *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). The parties dispute which standard of review should apply.

Greenwald argues that the STD Plan did not contain a grant of discretionary authority, and that even if Wells Fargo had discretionary authority, it was not properly delegated to the Short-Term Disability Appeal Committee that actually denied his claim. He also contends that a stray sentence in the final denial letter shows that Wells Fargo improperly delegated its decisions to the *Wachovia* Short-Term Disability Appeal Committee. As the Court explains below, all three arguments are without merit: the STD Plan *did* grant Wells Fargo discretionary authority, that authority was properly delegated to the Committee, and there is no evidence that Wachovia was involved in deciding Greenwald's claim. So, the Court reviews the decision under an abuse of discretion standard.

As noted above, Appendix B of the Benefits Book provided that as plan administrator, Wells Fargo had "full discretionary authority to administer and interpret each plan and may delegate its duties and discretionary authority to certain designated personnel and third parties, including but not limited to the Director of Human Resources and the Director of

- 20 -

Compensation and Benefits." Filing 39-3 at 225. Greenwald argues that because this grant of authority was contained only in the summary plan description, it was not controlling. He relies upon *Jobe v. Medical Life Ins. Co.*, 598 F.3d 478 (8th Cir. 2010), for the proposition that "a grant of discretion to the plan administrator, appearing only in a summary plan description, does not vest the administrator with discretion where the policy provides a mechanism for amendment and disclaims the power of the summary plan description to alter the plan." *Id.* at 484; *see also Ringwald v. Prudential Ins. Co. of America*, 609 F.3d 946 (8th Cir. 2010). But *Jobe* is inapposite, because in the present case, the summary description and Plan are one and the same. And "[w]here no other source of benefits exists, the summary plan description *is* the formal plan document, regardless of its label." *Admin. Comm. of Wal–Mart Stores, Inc. Associates' Health and Welfare Plan v. Gamboa*, 479 F.3d 538, 544 (8th Cir. 2007).

This is true even though the Benefits Book labeled itself the summary plan description, referred to separate "official" plan documents, and stated that the "official" plan documents were to control in the event of any conflict with the summary plan description. *Id.* at 543–45; *see* filing 39-3 at 11, 145. That is because Greenwald has not come forward with any evidence that there was a separate "official plan document." Instead, the record shows that there were only the documents contained in the Benefits Book. Defendants have submitted an affidavit from Harriet Michael, the Wells Fargo employee who managed the second-level appeal process of Greenwald's STD claim and was responsible for responding to requests for documents under the STD Plan. Filing 51-1 at ¶¶ 1–4. Michael stated that there were no formal plan documents for the STD Plan other than the Benefits Book, and that chapters 1 and 9 of the Benefits Book, along with appendix B, functioned as both the summary plan description and formal plan document. Filing 51-1 at ¶ 14. Greenwald has moved to strike these statements, arguing that on his claim for benefits, the Court is limited to considering the administrative record, and that Michael's statements are improper legal conclusions.

Greenwald's first evidentiary argument is correct as a general matter: under ERISA, the Court's review is generally limited to the administrative record. Under an abuse of discretion standard, this restriction is mandatory. *Brown v. Seitz Foods, Inc., Disability Ben. Plan*, 140 F.3d 1198, 1200 (8th Cir. 1998); *see also Ferrari v. Teachers Ins. and Annuity Ass'n*, 278 F.3d 801, 807 (8th Cir. 2002). Under de novo review, considering outside evidence is discouraged, in order to "ensure expeditious judicial review of ERISA benefit decisions and to keep district courts from becoming substitute plan administrators." *Seitz Foods*, 140 F.3d at 1200. However, limited discovery is allowed to determine the appropriate standard of review. *Farley v. Arkansas*

*Blue Cross and Blue Shield*, 147 F.3d 774, 776 n.4 (8th Cir. 1998). Michael's affidavit fits comfortably within this exception. And to the extent that Michael is stating whether or not another document existed, she has provided statements of fact, not legal conclusions.

The outcome would be the same if the Court refused to consider Michael's statements. Greenwald has failed to produce any other "official" Plan document. He argues that chapter 9 of the Benefits Book, which described the STD Plan, should be considered the formal plan document, because the chapter is titled "Short-Term Disability Plan." This argument is without merit. Chapter 9 repeated the statement from chapter 1, that it, along with chapter 1 and appendix B, made up the summary plan description. Filing 39-3 at 145. So, chapter 9 itself made clear that it was only *part* of the summary plan description, and that the appendix (and the grant of discretion it contained) was also part of the summary plan description. And since the summary plan description was the only source of benefits, it was the Plan. *Gamboa*, 479 F.3d at 542.

Greenwald next argues that, even if the grant of discretion in the appendix was effective, Wells Fargo did not properly delegate that authority to the Short-Term Disability Committee. Absent a proper delegation of authority, the Committee's decision would not be entitled to deferential abuse-of-discretion review. *See, Maher v. Massachusetts General Hosp. Long Term Disability Plan*, 665 F.3d 289, 291 (1st Cir. 2011); *Sharkey v. Ultramar Energy Ltd., Lasmo plc, Lasmo (AUL Ltd.)*, 70 F.3d 226, 229 (2d Cir. 1995); *Madden v. ITT Long Term Disability Plan for Salaried Employees*, 914 F.2d 1279, 1283–84 (9th Cir. 1990). Greenwald seizes on the fact that while the grant of discretion contained in the appendix authorized Wells Fargo to delegate its authority to certain designated parties, it did not explicitly refer to the Appeal Committee. Greenwald argues that de novo review is appropriate because the Plan does not mention the Committee, and because there is nothing in the record expressly stating that such a delegation occurred.

But as a corporation, Wells Fargo could only act through its agents and employees, and the Court finds that the Appeal Committee was acting as an agent of Wells Fargo when it denied Greenwald's benefits. The Committee's decision was written on Wells Fargo letterhead and was signed "Donna McMillan for Wells Fargo Short-Term Disability Appeal Committee." Filing 39-4 at 17–19 (emphasis supplied). There is no indication that McMillan or the Committee were not acting as Wells Fargo's agents when they denied Greenwald's claim. *Zurndorfer v. Unum Life Ins. Co. of America*, 543 F. Supp. 2d 242, 256–57 (S.D.N.Y. 2008). A plan "need not spell out in intricate detail who has the discretion, other than to specify that those charged with

- 22 -

implementing it will have such discretion." *Butts v. Continental Cas. Co.*, 357 F.3d 835, 838 (8th Cir. 2004).

Finally, the last denial letter from Wells Fargo stated, "The *Wachovia* Short Term Disability Appeal Committee reviewed your appeal request . . . . [and] upholds the denial decision rendered by Liberty . . . ." Filing 39-4 at 17 (emphasis supplied). Greenwald argues that, if Wachovia was somehow involved in the decision to deny his claim, the decision was not entitled to deference. But the vastly more reasonable explanation is that this was simply a typographical error. Again, the denial letter was printed on Wells Fargo letterhead and signed by Donna McMillan as a Wells Fargo employee. Filing 39-4 at 17, 19.

In sum, the Court finds that the STD Plan conferred discretionary authority upon Wells Fargo, which was delegated to and exercised by the Wells Fargo Short-Term Disability Appeal Committee in denying Greenwald's claim. Accordingly, the abuse of discretion standard applies.

## B. Abuse of Discretion Standard

To determine whether a plan administrator's decision was an abuse of discretion, the Court examines whether the decision was reasonable and supported by substantial evidence. *Green v. Union Sec. Ins. Co.*, 646 F.3d 1042, 1050 (8th Cir. 2011); *Manning v. American Republic Ins. Co.*, 604 F.3d 1030, 1038 (8th Cir. 2010). Substantial evidence is more than a scintilla but less than a preponderance. *Green*, 646 F.3d at 1050. A decision should be upheld if a reasonable person *could* have reached a similar decision, given the evidence before him; the Court need not find that a reasonable person *would* have reached that decision. *Id.* In other words, when a plan administrator offers a reasonable explanation for its decision, supported by substantial evidence, the decision should not be disturbed. *Ratliff v. Jefferson Pilot Fin. Ins. Co.,* 489 F.3d 343, 348 (8th Cir. 2007).

When evaluating whether a decision was an abuse of discretion, the Court should consider the impact of any conflict of interest on the part of the administrator. *Metro. Life Ins. Co. v. Glenn,* 554 U.S. 105 (2008); *Manning,* 604 F.3d at 1038. A "structural" conflict of interest exists when the same entity both determines eligibility for benefits and pays benefits out of its own pocket. *Glenn,* 554 U.S. at 108. If such a conflict is present, the Court should consider it as a factor in determining whether the plan administrator abused its discretion. *Manning,* 604 F.3d at 1038. The significance of this factor depends on the particular circumstances of the case. *Glenn,* 554 U.S. at 117. It will prove more important where circumstances suggest a higher likelihood that the conflict affected the benefits decision, such as where an administrator has a history of biased claims administration. *Id.* Conversely,

when an insurer has taken steps to reduce the risk that the conflict will affect eligibility determinations, the conflict should be given much less weight. *Id.* Where there is a conflict, but the record contains no evidence regarding its impact, the Court should give the conflict "some weight." *Manning,* 604 F.3d at 1039. And in a close case, a conflict may act as a tiebreaker. *Glenn,* 554 U.S. at 117.

Defendants concede that Wells Fargo was responsible both for making eligibility determinations and providing benefits under the STD Plan, and that there existed a structural conflict as defined by *Glenn*. Filing 52 at 66. Neither party has offered evidence that the conflict was more or less likely to have affected Wells Fargo's decision. So, the Court gives the conflict "some weight" in its analysis.

## C. Less Deferential "Sliding Scale" Review

The Court's review under the abuse of discretion standard will become less deferential if the claimant can present material, probative evidence that a serious "procedural irregularity" existed, which caused a "serious breach of the plan administrator's fiduciary duty to the claimant." *Manning,* 604 F.3d at 1038; *Woo v. Deluxe Corp.,* 144 F.3d 1157, 1162 (8th Cir. 1998), *abrogated on other grounds by Glenn,* 554 U.S. 105.[15] The second prong of *Woo* presents a "considerable hurdle" for plaintiffs. *Torres v. UNUM Life Ins. Co. of America,* 405 F.3d 670, 679 (8th Cir. 2005). The irregularities must have been so egregious as to trigger a "total lack of faith in the integrity of the decision making process." *Chronister v. Baptist Health,* 442 F.3d 648, 655 (8th Cir. 2006). If that hurdle is cleared, the Court applies a "sliding scale" approach to its abuse of discretion review: the more serious the procedural irregularity, the less deference the Court will afford the administrator's decision. *Woo,* 144 F.3d at 1162. Correspondingly, the Court will require more evidence in support of the administrator's decision, and in particularly egregious cases, this may require "substantial evidence bordering on a preponderance." *Id.*

Greenwald argues that numerous procedural irregularities marred defendants' review of his claim. He does not separately analyze these alleged

---

[15] Previously, the first prong of *Woo* could be satisfied by a procedural irregularity *or* a "palpable conflict of interest." *Woo,* 144 F.3d at 1162. But in *Glenn,* the Supreme Court held that conflicts should simply be analyzed as one of several factors under an unadulterated abuse of discretion standard. *Glenn,* 554 U.S. at 108, 116. Post-*Glenn,* it is an open question whether *Woo's* sliding scale review is still triggered by procedural irregularities. *See Wrenn v. Principal Life Ins. Co.,* 636 F.3d 921, 924 n.6 (8th Cir. 2011). But it is a question the Court need not attempt to answer, because in this case, Wells Fargo's decision will be reversed even under a straight abuse of discretion standard.

irregularities under the *Woo* standard. Instead, he argues that each alleged shortcoming was both a procedural irregularity (entitling him to a less deferential standard of review) and a factor to be considered under the abuse of discretion analysis. As explained below, the Court has reviewed the claimed errors and finds that none rise to the level of a procedural irregularity.

ANALYSIS
I. Greenwald Claim for Benefits Under the STD Plan
A. Procedural Irregularities

Greenwald first attempts to cast doubt on Lilly's competence to conduct a review of his medical record, and claims that Wells Fargo erred in relying on Lilly's report. This argument is without merit and quickly disposed of. Greenwald's remaining arguments have more heft. Taken together, they may be summarized as follows. Greenwald asserts that defendants erred by requiring objective evidence of the effects of his conditions, because the Plan did not require objective evidence and because his conditions were inherently subjective. Greenwald argues that this abuse of discretion was magnified when defendants rebuffed his attempts to determine what sort of objective evidence they were looking for. And while Wells Fargo eventually told Greenwald that it was looking for a functional capacity evaluation, it waited to do so until after it denied his final appeal, when it was too late for him to provide any evaluation. Finally, Greenwald faults defendants for crediting the reports of Kerstman and Lilly over his treating physicians.

1. Lilly's "Professional Woes"

Greenwald argues that Wells Fargo erred in relying on Lilly's report, because while Lilly was reviewing Greenwald's claim he was "distracted by his own professional woes including 108 pending medical negligence claims against him and an ongoing disciplinary investigation for 'a lack of professional competence to practice medicine with a reasonable degree of skill and safety for patients'" Filing 48 at ¶ 15j (quoting West Virginia Board of Medicine, *Second Amended Disciplinary Complaint*, at 6 (July 6, 2011), http://www.wvbom.wv.gov/publichearings_files/lillycnoh.pdf (last accessed March 20, 2013)). Even assuming that the Court should consider this extra-record material, it does not show that Lilly was "distracted." That distraction was not apparent in Lilly's report (despite its shortcomings, discussed below). And the nature of the disciplinary charges and complaints against Lilly were

not sufficiently similar in nature to the case at hand to cast doubt on his ability to conduct a paper review of Greenwald's medical record.[16]

### 2. Requiring Objective Evidence

Wells Fargo did not abuse its discretion by requiring Greenwald to produce objective evidence that he was disabled. Where, as here, a plan places the burden on the claimant to provide the necessary information in support of a claim, the claimant cannot shift the burden of investigation to the plan administrator. *Sahulka v. Lucent Technologies, Inc.*, 206 F.3d 763, 769 (8th Cir. 2000). "In such cases, a rule compelling plan administrators to independently investigate and verify the information that claimants submit would add substantial and unnecessary costs to the administration of ERISA plans." *Id.* Here, the Plan stated that it was Greenwald's "responsibility to ensure that Liberty receives requested medical proof, which may include medical records, test results, and hospitalization records . . . ." Filing 39-3 at 149.

The STD Plan did not expressly require "objective evidence" of disability.[17] Instead, the Plan required Greenwald to submit "medical proof," and "clinical evidence," which were defined as including (but not limited to), medical records, test results, physical therapy notes, and prescription records. Filing 39-3 at 148–49. But "objective evidence" fits just as neatly into that list, and requiring it was a reasonable interpretation of the Plan's terms. *See Pralutsky v. Metropolitan Life Ins. Co.*, 435 F.3d 833, 839 (8th Cir. 2006); *see also Manning*, 604 F.3d at 1041–42. This interpretation is all the more reasonable given the general rule that it is not an abuse of discretion to deny benefits based on a lack of objective evidence. *Pralutsky*, 435 F.3d at 839; *McGee v. Reliance Standard Life Ins. Co.*, 360 F.3d 921, 924–25 (8th Cir. 2004).

And in any event, in the second denial letter, sent May 2, 2011, Liberty Life put Greenwald on notice that he should submit objective evidence of his disability. The letter advised Greenwald that his file did not contain "sufficient or current physical exam findings to correlate with a severe and

---

[16] The disciplinary charges related to a bacteria outbreak at an outpatient clinic Lilly operated, caused by breaches in infection control protocols. *See* West Virginia Board of Medicine, *Consent Order*, at ¶¶ 1–10 (November 14, 2011), http://www.wvbom.wv.gov/orders/MD11322B.pdf (last accessed March 20, 2013).

[17] Defendants point to a separate provision of the Plan, which stated that STD benefits could end before the maximum payout if, among other reasons, Greenwald failed to provide requested medical records or "objective medical proof in a timely manner." Filing 39-3 at 152. But that section is not at issue: it governed decisions to terminate benefits, not whether to grant or deny them in the first place.

impairing condition that would preclude [him] from performing" his job requirements. Filing 39 at 73. This language, taken alone, might not have put Greenwald on notice that defendants were looking for "objective evidence." But the rest of the letter made that clear. It explained that his claim was previously denied on the initial review for lack of "objective exam findings or diagnostic studies to corroborate with your self-reported symptoms and inability to continue working." Filing 39 at 72. It quoted Kerstman's findings on which restrictions and limitations were supported by Greenwald's symptoms and diagnostic testing. The letter also quoted Kerstman's finding that there was no objective evidence supporting Greenwald's claims of cognitive impairment. Filing 39 at 73. In sum, the Plan required Greenwald to submit "the requested medical proof," and this letter requested "objective evidence" that he could not perform his job requirements.

Greenwald next argues that defendants rebuffed his and Webb's attempts to determine what sort of objective evidence they were looking for. It is true that, early in the decision process, Greenwald and Webb made such inquiries without success. *See*, filing 39-1 at 107; filing 39 at 59. But after Liberty Life's initial (unhelpful) response that it "could not recommend treatment," Greenwald apparently stopped asking. Filing 39 at 59. And the May 2, 2011, letter made clear that defendants were looking for objective evidence of the effects of Greenwald's conditions and symptoms.

Finally, Greenwald argues that defendants erred by requiring objective evidence of his disability, when his impairments (chronic back pain and fatigue) were inherently subjective. Defendants do not dispute that Greenwald has long experienced chronic, severe pain, or that he was experiencing such pain in 2011. Nor did defendants, or their physician reviewers, claim that Greenwald was malingering or exaggerating. Instead, defendants found that Greenwald failed to present sufficient "objective proof" of the *effects* of that pain on his ability to perform the essential functions of his job. That was not an abuse of discretion.

Although a plan "may not deny benefits solely on the basis that the symptoms of the claimed disability are subjective, . . . a plan may deny benefits because a claimant has failed properly to document pain-induced functional limitations." *Majeski v. Metropolitan Life Ins. Co.*, 590 F.3d 478, 485 (7th Cir. 2009). In *Pralutsky*, the Eighth Circuit upheld the administrator's demand for objective proof, stating, "[t]his is not a case in which MetLife unreasonably expected Pralutsky to guess what evidence would satisfy the plan administrator. MetLife specifically identified and requested additional clinical evidence supporting the severity of Pralutsky's condition." *Pralutsky*, 435 F.3d at 840; *see also Johnson v. Metropolitan Life*

*Ins. Co.*, 437 F.3d 809 (8th Cir. 2006) (no abuse of discretion to require objective evidence of disability where the administrator notified claimant her file lacked the required evidence). That said, there may be cases in which objective evidence simply cannot be obtained, and requiring an "impossible level of objective proof" would amount to an abuse of discretion. *Pralutsky*, 435 F.3d at 839.

At this stage, the Court cannot say that defendants were demanding an impossible level of proof. As Lilly pointed out, a functional capacity evaluation would have been helpful in determining the extent to which Greenwald's pain affected his ability to work. That is not to say that such evaluations will always be helpful, or would even have been helpful in this case. However, no such evaluation was done in this case, and the Court cannot find that, under these circumstances, the defendants were requesting an "impossible level of objective proof."

### 3. Failing to Request an Evaluation Before the Final Denial

Greenwald next argues that, if Wells Fargo or Liberty Life wanted him to submit a functional capacity evaluation, they should have asked for it before it was too late. This omission on defendants' part stands out because Wells Fargo's own expert, Lilly, stated that such an evaluation would be very helpful in assessing the extent of Greenwald's disability, and because the Plan specifically granted defendants the right to insist that Greenwald submit to an evaluation. Filing 39-3 at 150. Defendants, however, waited until the final denial letter to tell Greenwald that a functional capacity evaluation might have proved his claim to their satisfaction—and by then it was too late for Greenwald to submit additional evidence.

ERISA calls for a "meaningful dialogue" between the plan administrators and their beneficiaries. *Booton v. Lockheed Med. Benefit Plan*, 110 F.3d 1461, 1463 (9th Cir. 1997). By failing to ask for a functional capacity evaluation until it was too late, Greenwald claims, defendants failed to engage in a meaningful dialogue. There is support for this view—outside the Eighth Circuit. For example, in *Saffon v. Wells Fargo & Co. Long Term Disability Plan*, 522 F.3d 863, 870–73 (9th Cir. 2008), the Ninth Circuit held that if an administrator thinks a functional capacity evaluation, or some other test, would be useful in evaluating a claim, it must ask for it at a time when the claimant had a fair chance to present such evidence.

But Greenwald has not convinced the Court that the Eighth Circuit would follow *Saffon*. The Court's review of Eighth Circuit precedent, unfortunately, suggests otherwise. It is clear that there is no absolute requirement that an administrator obtain an independent medical examination or functional capacity evaluation. *Torres*, 405 F.3d at 678. And

Greenwald presents no argument or reason he could not have obtained an evaluation himself. *See Pralutsky*, 435 F.3d at 840–41. He was notified that defendants were seeking evidence of the effects of his conditions on his ability to work. Moreover, Webb advised Greenwald that he might need to undergo an independent disability evaluation.[18] Filing 39-1 at 118.

In short, this is not a case where there were irregularities so severe that the Court has a "total lack of faith in the integrity of the decision making process." *Pralutsky*, 435 F.3d at 838. Instead, this is a "dispute over whether the administrator reasonably interpreted the plan to require objective medical evidence to prove the claimant's disability, and whether the record supports the administrator's exercise of judgment that benefits should be denied based on the evidence that was presented." *Id.* And in any event, it does not matter if any of the alleged shortcomings in defendants' review amounted to procedural irregularities, because the decision to deny Greenwald's claim was not supported by substantial evidence, and fails even under an unadulterated abuse of discretion standard. That said, the Court will weigh defendants' conduct, and in particular, their failure to obtain an evaluation, as part of its abuse of discretion analysis. Greenwald's final argument, that defendants erred by crediting the paper reviews of Kerstman and Lilly, who never examined him, over the opinions of his treating physicians, is more aptly discussed in the context of an abuse-of-discretion analysis, to which the Court now turns.

### B. The Denial of Benefits Was an Abuse of Discretion

The Court finds that the denial of Greenwald's claim was not supported by substantial evidence and was therefore an abuse of discretion. But this was not because, as Greenwald argues, defendants should have credited the opinions of his treating physicians over the reviews of Kerstman and Lilly.

---

[18] Greenwald also argues that waiting until the end to request an evaluation amounted to "tacking on a new reason" for the denial of benefits, with the effect of insulating its rationale from review, a maneuver that contravenes the purposes of ERISA and is frowned upon by courts. *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 974 (9th Cir. 2006); *see also Wenner v. Sun Life Assurance Co. of Canada*, 482 F.3d 878, 882 (6th Cir. 2007). That is not what happened here. True, defendants did not request an evaluation until it was too late. But from early in the process, defendants had been requesting objective evidence of Greenwald's inability to work. And Wells Fargo did not deny Greenwald's claim for failure to submit a functional capacity evaluation—it denied it for failing to submit objective evidence. *See* filing 39-4 at 19. This is not the same as "tacking on a new reason" for denying Greenwald's claim. *See Kao v. Aetna Life Ins. Co.*, 647 F. Supp. 2d 397, 412–13 (D. N.J. 2009).

The "treating physician rule"—that opinions of treating physicians must be accorded special weight—does not apply to disability benefit determinations under ERISA. *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 825 (2003). So, an "administrator has discretion to deny benefits based upon its acceptance of the opinions of reviewing physicians over the conflicting opinions of the claimant's treating physicians unless the record does not support the denial." *Midgett v. Washington Group Int'l Long Term Disability Plan,* 561 F.3d 887, 897 (8th Cir. 2009). Nor is it an abuse of discretion to ignore a treating physician's opinion when the physician failed to provide reliable objective evidence or other proof to support a finding of disability. *Manning,* 604 F.3d at 1041.

The medical record contains ample evidence that Greenwald has long suffered from back problems and chronic pain. But he submitted little evidence that, as of February 2011, these conditions rendered him unable to work. Prior to 2011, the last record of any visit to a doctor for back pain was from June 2009.[19] Filing 39-1 at 38. The record contains no back-pain related doctor visits until February 25, 2011, after Greenwald had stopped working. The only recent medical evidence submitted by Greenwald was one office note from Webb, and his response to Liberty Life's questionnaire, a handful of notes from McCullen and Koebernick, and his own letter describing his symptoms and treatment.

Defendants were entitled to rely on the opinions of their reviewing physicians unless their opinions lacked support in the record or the evidence relied upon "does not ring true and is overwhelmed by contrary evidence." *Torres,* 405 F.3d at 682. The opinions of Greenwald's treating physicians, while supportive of his claim for disability, could not fairly be called "overwhelming" evidence of disability. Webb opined that Greenwald could not sit or stand for more than 30 minutes at a time and that his ability to walk was limited. Filing 39-1 at 108. But he did not state how long in a given day Greenwald could sit, stand, or walk. McCullen offered a more conclusive, but less specific opinion. He believed Greenwald's complaints of pain, and found that it would be "best" for Greenwald to take 6 months off work to focus on pain management with Essay. Filing 39-4 at 38. And Koebernick stated that he and McCullen felt Greenwald was an "excellent candidate to receive disability." Filing 39-4 at 37.

The physicians offered limited objective verifications of Greenwald's complaints, and they did little to translate their clinical findings into functional limitations. At his April 29, 2011, examination, Koebernick

---

[19] Greenwald apparently met with Essay at some point after June 2009. *See* filing 39-1 at 39. But there is no record of these visits.

detected "a lot of spasm" above the L2-3 level and extending up into the thoracic spine, some tenderness on both sides of the lumbosacral region, and "elements of a straight leg raise on the right." Filing 39-4 at 39. And McCullen noted that an updated MRI revealed "evidence of degenerative changes at L3-4 and L4-5" but no recurrent herniation at those points. Filing 39-4 at 38. Neither Koebernick or McCullen provided any opinion regarding Greenwald's functional limitations. And neither specifically tied their clinical findings to their opinion that Greenwald would have been an excellent candidate for disability. And, as noted above, Greenwald did not provide any records from Essay, his pain management specialist.

The letter written by Greenwald provided useful information, but was somewhat lacking in specificity. He did not state how long each day he could sit, stand, or walk. He did not explain what steps he had taken to try to work. There was little discussion of how his pain affected his daily activities. And while he stated generally that his medications made it difficult to concentrate, Greenwald provided no examples of tasks at work that he was unable to perform, or how his medications affected the quality of his work.

If this were the only evidence in the record, then defendants could potentially have concluded that Greenwald had failed to offer sufficient objective evidence that his condition prevented him from working. Defendants were not required to articulate a theory for Greenwald's inability to perform his job, but rather to consider the evidence he submitted to determine whether it proved him disabled. *Torres,* 405 F.3d at 678.

But the records submitted by Greenwald were not the only evidence before defendants. One of defendants' own reviewing physicians, Kerstman, did, in fact, find objective evidence of disabling impairments. He found that Greenwald was limited to sitting for 30 minutes at a time, for a total of 6 hours per day, and limited to standing or walking for 15 minutes at a time each, for a total of 1 hour of each per day. Filing 39 at 78–79. He found that these limitations were caused by Greenwald's spinal conditions and were "supported by [Greenwald's] symptoms and diagnostic testing." Filing 39 at 78–79 (emphasis supplied). In other words, those impairments were supported by "objective medical evidence." Kerstman then found that, despite these restrictions, Greenwald could perform "sustained sedentary capacity work." Filing 39 at 79. And in denying Greenwald's claim after his first appeal, Liberty Life seized on this finding.

The problem is, Kerstman's review stated a conclusion that was "arguably on a different plane than the proper inquiry." *Elliott v. Metro. Life Ins. Co.,* 473 F.3d 613, 620 (6th Cir. 2006). The phrase "sedentary work" appeared nowhere in the STD Plan. The proper inquiry was whether Greenwald was disabled from performing the essential functions of his "own

- 31 -

job as regularly scheduled for longer than the STD waiting period." Filing 39-3 at 148 (emphasis supplied).

Greenwald's position required him to "frequently" sit for 3 to 6 hours per day, "occasionally" walk 30 minutes to 3 hours per day, occasionally stand 30 minutes to 3 hours per day, and occasionally drive a car to meet with clients. Filing 39 at 85–86. This description of Greenwald's duties was provided by Wells Fargo. The top of the form stated: "The completed form will be reviewed by the Liberty Mutual Case Manager to determine whether the employee is able to return to his/her job. This is an important document and should accurately show the requirements of the employee's job." Filing 39 at 85 (emphasis supplied).

Kerstman found that Greenwald could only stand or walk for 15 minutes at a time and for up to 1 hour each per day. Filing 39 at 78–79. That means that, on occasion, Greenwald could not perform his job, when his job required him to walk or stand for up to 3 hours a day. Defendants argue that Greenwald's job was, in fact, sedentary, and that he spent most of the day on the phone, on the computer, or in meetings. *See*, filing 52 at 58; filing 39 at 65. That may have been. But if Greenwald was required to sit for more than 6 hours a day, then according to Kerstman, he would still be considered disabled under the STD Plan, as Kerstman found Greenwald could only sit for a total of 3 to 6 hours a day.

Defendants also claim that Greenwald could have worked using a sit/stand option, stating, there was "nothing in Plaintiff's job description that prohibits him from changing positions as needed, i.e. periodically alternating between sitting and standing when performing his job duties." Filing 52 at 59 (underlining in original). But such an option does not appear in Greenwald's job description and was never mentioned in the administrative record. Such an option *might* have existed, but it is not clear from the record. More to the point, standing did not offer Greenwald much relief. A sit/*lie* option would have been more useful to him. The record reveals that he had done this, but that it was no longer working for him. *See, e.g.*, filing 39-1 at 118. More importantly, the record does not show whether Greenwald could have satisfactorily performed his job duties with a sit/lie option.

Wells Fargo did not disclaim Kerstman's findings. Instead, Wells Fargo continues to assert that it was reasonable for Liberty Life and itself to rely on Kerstman's report and the restrictions and limitations he set forth. Filing 52 at 58. Even so, if Lilly had rejected Kerstman's findings, his opinion could have constituted substantial evidence to deny Greenwald's claim. But Lilly's report did not address the shortcomings of Kerstman's report. Lilly did find (albeit "grudgingly") that "the determination for benefits is not supported by objective evidence in the medical documentation as per wording in the plan."

- 32 -

Filing 45 at 7. However, after reading Lilly's report in its entirety, it is impossible to tell if, like Kerstman, Lilly was answering the proper inquiry: i.e., whether Greenwald was disabled from performing the essential functions of his own job for any period of time after the 7-day STD waiting period. Filing 39-3 at 148.

Lilly's report failed to answer the proper inquiry in several respects. First, it is not clear if Lilly based his analysis on the correct job description. Lilly referenced the job description provided by Wells Fargo, and correctly summarized portions of it, including the fact that Greenwald was required to sit for 3 to 6 hours a day. Filing 45 at 1. But when it came to standing and walking, he only noted that each was required "occasionally." Lilly did not note that each was occasionally required for up to 3 hours.

Second, Lilly may have been focused on the wrong type of disability benefits entirely, or applying the wrong standard for short-term benefits. He began his report by stating that the question presented was "whether the conditions reported support <u>long-term</u> restrictions and limitations." Filing 45 at 1 (emphasis supplied). Why Lilly was focused on long-term restrictions is unclear. The STD Plan only required a period of disability longer than the 7-day waiting period. Lilly may not have believed Greenwald was disabled for the full 26 weeks. That might or might not have been what Lilly meant by "long-term." But if Greenwald was disabled for more than 1 week, he was entitled to benefits under the STD Plan.

Lilly's report suffers from another deficiency: he stated that Greenwald's subjective complaints of disabling pain were validated by his treating physicians, but that "objective findings [were] scant, other than reports of atrophy and muscle weakness." Filing 45 at 6. In making this statement he overlooked several objective findings, including his own finding that Greenwald's reports of persistent lumbar and cervical pain were supported by his scoliosis and diffuse cervical and lumbar facet arthrosis. Filing 45 at 6. And he failed to mention the objective findings from Koebernick's April 29, 2011, physical examination, including "a lot of spasm" above the L2-3 level and up into the thoracic spine, tenderness on the lumbosacral region, and "elements of a straight leg raise" on the right. Filing 39-4 at 39. Nor does Lilly mention the updated MRI reviewed by McCullen in May 2011, which found evidence of degenerative changes at the L3-4 and L4-5 levels. Filing 39-4 at 38. The Court cannot tell whether Lilly reviewed these notes at all.

Ultimately, Lilly did not make his own assessment of Greenwald's functional capacity. Instead, he stated only that the "determination for benefits is not supported by objective evidence . . . as per wording in the plan." Filing 45 at 7. For this to qualify as evidence in support of Wells

Fargo's decision, the Court must ignore the above shortcomings, and assume that Lilly was working with an accurate idea of Greenwald's job description, that Lilly was determining eligibility for <u>short-term</u> benefits, and that Lilly had fully considered all of the medical records, including the most recent visits to McCullen and Koebernick. Even with all of these assumptions in Lilly's favor, his conclusion was only that there was not enough objective evidence at the time of his review. Lilly did not conclude that Greenwald was not disabled. He did not suggest that Greenwald's complaints of disabling pain were not credible. To the contrary, he found that they were validated by McCullen, Webb, and Koebernick. Filing 45 at 6. And he recommended—at length—that Greenwald should be allowed to obtain a functional capacity evaluation. Filing 45 at 6–7.

When viewed against the other evidence in the record, Lilly's conclusion did not provide substantial evidence in support of Wells Fargo's decision. Kerstman found objective evidence Greenwald was disabled. And while Greenwald's treating physicians did not provide "overwhelming" evidence when called upon by Liberty Life and Wells Fargo, their opinions were consistent with a finding of disability. Defendants have not pointed to any reason (other than the lack of objective evidence) to doubt their reports. Webb had treated Greenwald as a patient for at least 12 years, and McCullen had treated him for over 6 years. Over those years, Webb believed Greenwald's reported symptoms—enough to prescribe strong pain control medications on numerous occasions. And McCullen performed (or recommended) several surgeries after more conservative treatments failed to address Greenwald's pain. In 2011, both of these treating physicians totally credited Greenwald when he said he was experiencing debilitating pain and could not work.

While an ERISA plan administrator need not accord special deference to a treating physician's opinion, an administrator may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician. *Nord*, 538 U.S. at 825, 834. This includes Greenwald's consistent complaints of pain, and his treating physicians' opinions based on those complaints. These constituted reliable, relevant evidence that could not be ignored. *Willcox v. Liberty Life Assur. Co. of Boston*, 552 F.3d 693, 701 (8th Cir. 2009); *see also Fiedor v. Qwest Disability Plan*, 498 F. Supp. 2d 1221 (D. Minn. 2007) (administrator abused its discretion in denying benefits by rejecting claimant's subjective complaints without making any determination regarding her credibility, and relying on the absence of a functional capacity evaluation which it never requested); *cf. Krizek v. Cigna Group Ins.*, 345 F.3d 91, 99, 101-02 (2d Cir. 2003) (upon de novo review of administrator's decision,

courts cannot dismiss complaints of pain as legally insufficient evidence of disability).

There was no evidence in the record that Greenwald was *not disabled* or that he was *able to work* after February 23, 2011. The fact that he was able to work previously, and that he was able to work for a short period in February 2011, is not sufficient to show otherwise. And there was certainly no "objective" evidence that Greenwald was not disabled or that his pain was not severe. Such evidence might have been found if he was using only limited and mild pain medication, or if he was not participating in pain treatment programs. *Montour v. Hartford Life & Acc. Ins. Co.*, 588 F.3d 623, 635 (9th Cir. 2009). But Greenwald was not taking "mild" pain medication, he was taking "powerful opioid analgesics." Filing 45 at 4. And he was seeing a pain management specialist, trying new and increased amounts of pain medications, and doing physical therapy.

This Court further considers the fact that neither Liberty Life or Wells Fargo ever ordered an independent medical examination or functional capacity evaluation, even though the right to do so was reserved in the Plan. Filing 39-3 at 150. While this did not necessarily rise to the level of a procedural irregularity, the Court may consider it as part of its abuse-of-discretion analysis. *Post v. Hartford Ins. Co.,* 501 F.3d 154, 161 (3d Cir. 2007), *overruled on other grounds by Estate of Kevin Schwing v. Lilly Health Plan,* 562 F.3d 522, 525 (3d Cir. 2009). "[A] plan's decision to conduct a file-only review—especially where the right to [conduct a physical examination] is specifically reserved in the plan—may, in some cases, raise questions about the thoroughness and accuracy of the benefits determination." *Elliot,* 473 F.3d at 621. Defendants were not generally obligated, as a matter of law, to obtain a functional capacity evaluation, or recommend that Greenwald do so. But when the only evidence in the record supported a finding of disability, defendants either had to grant the claim or cite substantial evidence in support of their denial. Even though Lilly recommended, at length, that Greenwald be allowed to obtain a functional capacity evaluation, Wells Fargo made no effort to obtain one.

In sum, the Court finds that it was an abuse of discretion to deny Greenwald's claim for STD benefits. The record contains substantial evidence that Greenwald's complaints of pain and fatigue were real and severe; and there was objective evidence that these symptoms left him unable to perform his job.

### C. Liberty Life is Not a Proper Defendant

Liberty Life argues that it is not a proper defendant to Greenwald's claim under the STD Plan, because Wells Fargo, not Liberty Life, was

responsible for making the final decision on benefits eligibility and for paying benefits. The Court finds this argument persuasive. Liberty Life's motion for summary judgment will be granted on this point, and Greenwald's first claim will be dismissed, as against Liberty Life.

As noted above, the STD Plan was self-insured. In other words, Wells Fargo funded the plan and was ultimately responsible for paying benefits. Filing 1 at ¶ 7; filing 29 at ¶ 7. Wells Fargo was also the plan administrator and sponsor. Filing 48 at ¶ 3; filing 39-3 at 47, 145, 225. Liberty Life, as a third-party claims administrator, handled only the initial levels of claim review. Filing 48 at ¶ 2. The final authority to approve or deny claims rested with Wells Fargo.

Determining which entities are proper defendants on a claim for benefits under § 1132(a)(1)(B) is "surprisingly complex." *Slayhi v. High-Tech Institute, Inc.*, 2007 WL 4284859, at *6 (D. Minn. 2007). The *Slayhi* court, however, has provided a persuasive method for analyzing this issue, and the Court finds it dispositive of the case at hand. In *Slayhi*, the plaintiff's employer, High-Tech, provided a health insurance policy administered by a third-party insurer, Aetna. *Id.* at *3–4. High-Tech was the plan's sponsor and administrator. *Id.* at *1, 7. However, Aetna handled all claims administration and had the final authority to approve or deny claims. *Id.* at *4. Aetna was also the plan's insurer and was responsible for paying claims. *Id.* at *10. The *Slayhi* court determined that, under these circumstances, the insurer, and not the employer, was the proper defendant.

Designating the proper defendant depends upon the relief sought. As here, the plaintiff in *Slayhi* sought an award of benefits per the terms of her plan, under § 1132(a)(1)(B). The court reasoned that,

> while an award of benefits under this section results in monetary relief, such an award is equitable, and not legal, in nature. That is, an award of benefits under § 1132(a)(1)(B) is in the nature of "an *in personam* order enjoining the payment of benefits" and, accordingly, "must issue against a party capable of providing the relief requested."

*Id.* at *9 (quoting *Hunt v. Hawthorne Assocs., Inc.*, 119 F.3d 888, 908 (11th Cir. 1997)).[20] Accordingly, the proper defendant in a claim for benefits

---

[20] While not addressing this precise issue, the Eighth Circuit has held that, in the context of whether plaintiffs have a right to trial by jury, suits under § 1132(a)(1)(B) are equitable in nature. *In re Vorpahl*, 695 F.2d 318, 321–22 (8th Cir. 1982); *accord*, *Graham v. Hartford Life & Acc. Ins. Co.*, 589 F.3d 1345, 1355–57 (10th Cir. 2009); *Thomas v. Oregon Fruit Products Co.*, 228 F.3d 991, 996–97 (9th Cir. 2000).

is the party with authority, under the relevant plan documents,
to pay benefit claims from plan assets. . . . Put another way, if the
court ordered Aetna to pay benefits in this case, such a payment
would come from the insurance plan, since Aetna is the insurer.
But if the court ordered High-Tech to pay benefits in this case,
such a payment would not come from the insurance plan; it would
instead come from High-Tech's assets. Payment from High-Tech's
assets is not the payment of plan benefits, but the payment of
damages. Such payment could satisfy only a legal judgment, not
an equitable judgment.

*Id.* at *10.

The Eighth Circuit has reached the same result in a similar case.
*Brown v. J.B. Hunt Transport Services, Inc.*, 586 F.3d 1079, 1088 (8th Cir.
2009). In *Brown*, the court held that ERISA only provides a cause of action to
recover benefits due under the terms of the plan at issue, and therefore the
proper defendant is the party required by the plan to pay benefits. As in
*Slayhi*, the employer in *Brown* was the plan sponsor and administrator, but
the plan was insured by a separate entity, which determined eligibility and
paid benefits. *Id.* at 1081. Because the plan did not require the employer to
pay benefits, it was not a proper defendant. *Id.* at 1088.

Here, Wells Fargo delegated the initial levels of claim review to Liberty
Life. But Wells Fargo retained the final authority to determine eligibility for
benefits, and was ultimately responsible for paying benefits. So, following the
rationale of *Slayhi* and *Brown*, Liberty Life is not a proper defendant to
Greenwald's first claim. Accordingly, the Court will grant Liberty Life's
motion for summary judgment, and dismiss Greenwald's first claim, as
against Liberty Life.

### D. The Remedy is Remand

Greenwald has requested that the Court find he was entitled to
benefits under the STD Plan and award him the full amount of benefits
available. The Court is not convinced that this is the appropriate remedy.
Determining whether Greenwald was disabled under the STD Plan is a
matter best left to the plan administrator and the medical experts. So, the
Court will remand the case to Wells Fargo to determine whether, as of
February 25, 2011, Greenwald was disabled from performing his own job. A
remand is generally the appropriate remedy where the problem with the
administrator's denial was the decision-making process, not that the
claimant was denied benefits to which he was clearly entitled. *Elliott*, 473

F.3d at 622 (citing *Buffonge v. Prudential Ins. Co. Of America*, 426 F.3d 20, 31–32 (1st Cir. 2005)); *see also, Gallo v. Amoco Corp.*, 102 F.3d 918, 923 (7th Cir. 1996); *Miller v. United Welfare Fund*, 72 F.3d 1066, 1073–74 (2d Cir. 1995).

If the defendants remain undecided with respect to an award of short-term benefits, on remand, Greenwald shall be allowed to submit additional evidence, including a functional capacity evaluation. Defendants are directed to make findings with regard to Greenwald's specific position, not generic determinations regarding his capacity for "sedentary" work. The Court further directs that, in the event of further review on remand, if defendants decide to treat Greenwald's current claim for STD benefits as a "recurrent" condition, they must support the decision with substantial evidence. Under the STD Plan, for a condition to be recurrent, the condition must have been based on the "same cause or complication resulting from the initially medically certified health condition." Filing 39-3 at 150. Greenwald's prior claim, from January 2011, related to problems with his neck, stemming from a shoulder injury in 2009. Filing 39-1 at 30, 32–36, 62. Greenwald received STD benefits on this prior claim for the period he was recovering from surgery for this condition, from January 12 to January 31, 2011. Filing 48 at ¶¶ 8–9.

Greenwald's current claim, while filed shortly thereafter, was based on separate conditions in his lower and lower-middle back, hip, and lower extremities. These conditions predated his shoulder and neck problems by several years, and were the result of different, and unrelated, causes (e.g., his scoliosis and removal of portions of his hip muscles). Without some evidence linking these conditions to Greenwald's neck and shoulder problems, treating Greenwald's pending claim as recurrent would be erroneous.

## II. Claim for Penalties Under § 1132

Greenwald's third claim is brought solely against Wells Fargo, and seeks statutory penalties under § 1132(c) for Wells Fargo's failure to respond to his requests for copies of the "official plan documents" for the STD and LTD Plans.[21] ERISA permits the Court to impose a penalty for a plan administrator's failure to produce certain plan documents within 30 days of a participant's request. § 1132(c). This includes copies of the latest updated summary plan description or "other instruments under which the plan is established or operated." § 1024(b)(4); § 1132(c)(1)(B). The record shows a clear violation of ERISA's document-production requirements: after

---

[21] As the plan administrator, Wells Fargo is the only proper defendant to this claim. *See Settell v. Metropolitan Life Ins. Co.*, 633 F. Supp. 2d 695, 712 (N.D. Iowa 2009).

Greenwald requested covered documents on November 7, 2011, Wells Fargo did not respond until April 25, 2012.

As context for this failure to respond, the Court turns to a prior request for documents, received on October 27, 2011. On that date, Wells Fargo received a request from Greenwald for "all documents, records, and other information" related to his claim. Filing 51-1 at ¶ 10; filing 39-4 at 15, 50. The letter was forwarded to Harriet Michael, who received it the same day. Filing 39-4 at 50; filing 51-1 at ¶ 10. As noted above, Michael was the "Benefits Consultant" responsible for managing the second-level appeal process, which included responding to requests for Plan documents. She responded to Greenwald's request on November 10, 2011, by providing a copy of his claim file. Filing 51-1 at ¶ 11; filing 39-4 at 14.

On November 7, 2011, Wells Fargo received a second letter from Greenwald, requesting copies of the "official plan document(s)" governing the LTD and STD Plans. Filing 39-4 at 50; filing 45 at 15; filing 47 at ¶ 2. Wells Fargo's internal notes show that this letter was forwarded to Michael that same day. Filing 39-4 at 50. However, Michael averred that she never received this letter, had no record of receiving it, and that it was not contained in the administrative record she maintained for Greenwald's claim. Filing 51-1 at ¶¶ 21–22.

In December 2011, Michael received two more letters from Greenwald's counsel. Filing 51-1 at ¶ 12; filing 39-4 at 8–13. The first noted the confusing language in the Benefits Book and requested that Michael verify (among other things) whether the claim file she had sent contained the "official plan documents." Filing 39-4 at 11. The second letter requested verification that the entire claim file had indeed been sent and again requested a copy of "'the plan.'" Filing 39-4 at 8.

Michael averred that she began to collect information and compile a response in January 2012. Filing 51-1 at ¶¶ 16–17. However, she neglected to send the response. Filing 51-1 at ¶ 17. Michael offers no explanation for this omission, but stated that it was an inadvertent error and that she had no reason to avoid responding. Filing 51-1 at ¶¶ 17, 23.

On February 13, 2012, Michael received another letter from Greenwald's counsel, again requesting copies of the official STD and LTD plan documents. Filing 39-4 at 1–3; filing 51-1 at ¶ 18. Greenwald filed this suit on February 22. Filing 1. Michael averred that as soon as she was notified of this, she realized she had neglected to respond to the December requests, but assumed that she should not correspond with Greenwald while the case was being litigated. Filing 51-1 at ¶ 19. Finally, on April 25, 2012, Greenwald received a copy of the LTD Plan, and was notified that there was no separate, official STD plan document. Filing 47 at 1, 4–5.

Wells Fargo does not dispute that its failure to respond to Greenwald's November 7, 2011, request violated the production requirements of ERISA and triggered the possibility of penalties under § 1132(c). Because Wells Fargo had 30 days to comply with Greenwald's request for information, penalties did not begin to accrue until 31 days after Wells Fargo received Greenwald's request. *Boyadjian v. CIGNA Companies*, 973 F. Supp. 500, 507 (D. N.J. 1997); *see also Daniels v. Thomas & Betts Corp.*, 263 F.3d 66, 80 (3d Cir. 2001). The penalties continued to accrue until the day before Wells Fargo furnished the documents. *Boyadjian*, 973 F. Supp. at 507. Wells Fargo received Greenwald's request on November 7, 2011. Thirty days elapsed on December 7, and the penalties began to run from the 31st day, December 8. *See* Fed. R. Civ. P. 6(a)(1). The penalties ran until the day before Wells Fargo furnished the documents, April 24, 2012. This comes to a total of 140 days.

The only question before the Court is the appropriate amount of the daily penalty rate. Penalties under § 1132(c) are designed to provide plan administrators with an incentive to comply with ERISA's disclosure requirements and to punish noncompliance. *Starr v. Metro Systems, Inc.*, 461 F.3d 1036, 1040 (8th Cir. 2006). Section 1132(c) sets the maximum penalty at $100 a day, but this has been increased by regulation to $110 per day. *See* 29 C.F.R. § 2575.502c-3. Whether to assess a penalty, and the amount, are committed solely to the Court's discretion. § 1132(c). In exercising this discretion, the Court primarily considers any prejudice caused to the plaintiff and the nature of the plan administrator's conduct. *Starr*, 461 F.3d at 1040.

The Court finds Michael's actions constituted inexcusable inadvertence; however, Wells Fargo's delayed disclosure was not intentional and did not rise to the level of bad faith. The Court further finds that Greenwald was prejudiced by the delay, and that a penalty is warranted. ERISA's disclosure provisions were designed to ensure that an individual participant knows exactly where he or she stands with respect to the plan. *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 118 (1989). This requires ready access to information on how to apply for benefits and how to determine eligibility for benefits. *Mondry v. American Family Mut. Ins. Co.*, 557 F.3d 781, 793 (7th Cir. 2009). And prejudice in this context is not limited to a loss of benefits, but includes the lost time, effort, and money spent gaining access to information to which one was legally entitled. *See Brown v. Aventis Pharmaceuticals, Inc.*, 341 F.3d 822, 825 (8th Cir. 2003).

Greenwald had a right to receive the LTD Plan and timely notice that there was no separate, "official" STD Plan document. Both were essential for him to make informed decisions regarding his claims, at the administrative level and before this Court. Greenwald was forced to spend months trying to obtain a response that should have come without delay. Before turning to the

appropriate amount of the penalty, the Court must address one further matter.

Greenwald argues that an earlier interaction he had with a Liberty Life representative exacerbated the delay and should result in a higher penalty. On November 3, 2011, before sending his letter requesting the "official" documents, Greenwald called and spoke with a Liberty Life representative named Irene Martin. Filing 47 at ¶ 6; filing 72-2 at ¶1–5. Greenwald and Martin have submitted conflicting accounts of this conversation.

Greenwald averred that he requested an application for LTD benefits, but that Martin told him there was no separate application process for LTD claims. Filing 47 at ¶ 6. Instead, Martin told him that halfway through the 26-week STD period, Liberty Life would send the file to the LTD department, which would initiate the process for LTD benefits. Filing 47 at ¶ 6. And, according to Greenwald, Martin stated that there was no means of applying for LTD benefits unless a claimant was already receiving STD benefits. Filing 47 at ¶ 6. Greenwald averred that, having not received the official LTD plan documents, he relied on Martin's statement and did not press the matter further, and instead filed suit for his LTD benefits. Filing 47 at ¶ 7. Greenwald claimed that, had he received the official LTD plan documents, he would have known that LTD benefits were not dependent upon receipt of STD benefits, and would have insisted on filing an LTD claim in November 2011. Filing 47 at ¶ 7, 9–10.

Liberty Life's records contain a short note by Martin, summarizing her conversation with Greenwald. She noted that she had a "lengthy" conversation with Greenwald, and wrote:

> [Greenwald] stated he plans to pursue legal action and wanted to know if in the event his case is successful, would his LTD claim also be approved . . . [Martin] explained that if his STD claim were retroactively approved thru max benefit date and his disability was supported ongoing to and beyond the LTD benefit begin date, his claim could be considered for LTD.

Filing 39 at 57. Greenwald claims that this record is incomplete, in that it does not include his request to file an LTD claim. Filing 47 at ¶ 11.

Martin remembers the conversation differently. According to her, Greenwald asked whether his LTD claim would be approved if his lawsuit for STD claims was successful. Filing 72-2 at ¶ 6. She does not recall Greenwald asking to apply for LTD benefits, and states that if he had, she would have made a note of it. Filing 72-2 at ¶ 6. Martin was familiar with the LTD and STD plans, and knew that LTD benefits were not contingent upon receipt of

STD benefits, and denies telling Greenwald anything to the contrary. Filing 72-2 at ¶¶ 3, 7.

Greenwald argues that, because he was misinformed by Martin, he postponed filing his LTD claim. And, he claims, if he had been provided a copy of the official LTD claim, he would have realized that LTD benefits were not contingent upon receiving STD benefits. The conflicting accounts of Martin and Greenwald create an issue of fact that ordinarily the Court, on a motion for summary judgment, cannot resolve.

However, any remaining issue of fact is not material to resolution of Greenwald's claim. Greenwald has already established a violation of § 1132(c) that justifies imposing a penalty. What Martin may have told Greenwald only matters insofar as it affects the *amount* of any penalty Wells Fargo must pay. But even if the Court assumes the truth of Greenwald's statement of the facts, any misstatements by Martin would not result in a finding of additional prejudice, or a higher penalty.

Wells Fargo is being penalized for violating the production requirement of § 1024(b)(4), which requires plan administrators to respond to <u>written requests</u> in a timely fashion. § 1024(b)(4). The violation that occurred was Michael's failure to respond in a timely fashion. Greenwald's telephone call to Martin was not a written request, and anything Martin told Greenwald is irrelevant to the violation of § 1132(c). There is no evidence of any bad faith on Martin's part, and no evidence to connect her actions to Michael's failure to respond.

In short, the Court finds that Greenwald has demonstrated prejudice and that a penalty is warranted, but that Martin's conduct is not relevant to determining the penalty rate. Setting the penalty at the maximum rate of $110 a day would result in an award of $15,400. After considering all of the circumstances of this case, the Court finds that such an award is not warranted. Instead, the Court will impose a penalty of $40 a day, resulting in an award of $5,600. Using this rate accounts for the inexcusable neglect *in this case*, and leaves room for imposing greater penalties in cases of more egregious conduct.

Finally, Greenwald has requested an award of pre- and post-judgment interest on any amounts awarded to him. The Court finds that he is not entitled to pre-judgment interest on his penalty award. Pre-judgment interest is designed to compensate plaintiffs for the loss of the use of money owed. *Simeone v. First Bank Nat'l Ass'n*, 73 F.3d 184, 190–91 (8th Cir. 1996). But § 1132 damages are punitive, not compensatory, in nature. That said, now that Greenwald has received an award of damages, he is entitled to prompt payment, and post-judgment interest, pursuant to 28 U.S.C. § 1961, is appropriate.

- 42 -

### III. Greenwald's Request for Attorney Fees

Greenwald has requested an award of costs and attorney fees for both his first and third claims. ERISA provides that, for both of these claims, "the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." 29 U.S.C. § 1132(g)(1). In *Hardt v. Reliance Standard Life Ins. Co.*, 130 S. Ct. 2149 (2010), the Supreme Court clarified that a party need not attain "prevailing party" status to receive such an award, but must achieve "some degree of success on the merits." *Id.* at 2152, 2156–59. Greenwald has met this threshold on both his first and third claims. Although the Court did not award benefits on his first claim, Greenwald has attained a remand, which amounts to a "material change in the legal relationship of the parties" and constitutes a sufficient degree of success on the merits. *Id.* at 2155; *see also, Olds v. Retirement Plan of Int'l Paper Co., Inc.*, 2011 WL 2160264, *2 (S.D. Ala. 2011); *Scott v. PNC Bank Corp. & Affiliates Long Term Disability Plan*, 2011 WL 2601569, *7 (D. Md. 2011).

However, achieving some degree of success on the merits opens the door to an award of costs and fees; but, it does not by itself mandate a particular award. *See Toussaint v. JJ Weiser, Inc.*, 648 F.3d 108, 111 (2d Cir. 2011). The parties have previously submitted briefs and affidavits on Greenwald's motion for attorney fees on his second claim, for benefits under the LTD Plan. But they have not yet done so for his first and third claims. Greenwald shall submit a formal motion for attorney fees on these claims, together with any additional affidavits (as necessary). Both sides are also requested to submit additional briefs on whether an award of attorney fees is warranted, and the appropriate amount of any such award.

### CONCLUSION

After a careful review of the administrative record, the Court finds that defendants' denial of Greenwald's claim for benefits under the STD Plan was an abuse of discretion and will remand the claim for further administrative proceedings. Summary judgment will be entered in favor of Greenwald on this claim, as against Wells Fargo and the STD Plan. Summary judgment will be entered in favor of Liberty Life with respect to the STD claim. The Court also finds that Greenwald is entitled to summary judgment on his claim for statutory penalties under § 1132(c), and Wells Fargo shall be assessed a penalty of $5,600, together with post-judgment interest. Greenwald may be entitled to an award of costs and attorney fees on both claims, and the Court requests further briefing on the matter. Finally, Greenwald's motion to strike (filing 54) will be denied as moot. Accordingly,

IT IS ORDERED:

1.     As to Greenwald's first claim, for short-term disability benefits,

    a.     Judgment is entered in favor of Greenwald, and against defendants Wells Fargo and the STD Plan, and Greenwald's claim is remanded to Wells Fargo for further administrative proceedings consistent with this opinion.

    b.     Judgment is entered in favor of Liberty Life, and against Greenwald.

2.     Judgment is entered in favor of Greenwald on his third claim, for statutory penalties under 29 U.S.C. § 1132(c). Wells Fargo shall pay Greenwald $5,600, together with post-judgment interest under 28 U.S.C. § 1961.

3.     Greenwald shall submit a motion for attorney fees on his first and third claims, and any brief in support, on or before April 5, 2013. The parties may submit further briefs pursuant to NeCivR 7.0.1(b) and (c).

4.     Greenwald's motion to strike (filing 54) is denied as moot; and

5.     A separate judgment will  be entered.

Dated this 20th day of March, 2013.

            BY THE COURT:

            John M. Gerrard
            United States District Judge

- 44 -